**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION**

| | | |
|---|---|---|
| **RICHARD DAVIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:15-cv-01305-STA-egb** |
| | ) | |
| **KOHLER CO.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

---

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND DENYING JOINT MOTION TO CONTINUE AS MOOT**

---

Plaintiff Richard Davis filed this action against his former employer Kohler Co., alleging racial discrimination and retaliation in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and the Tennessee Human Rights Act, as codified at Tenn. Code Ann. § 4-21-101 *et seq.* ("THRA"). Defendant has filed a motion for summary judgment. (ECF No. 34.) Plaintiff has filed a response (ECF No. 38), and Defendant has filed a reply to the response. (ECF No. 40.) Defendant's motion is **GRANTED**. The joint motion to continue the trial of this matter (ECF No. 45) is **DENIED** as moot.

<u>Standard of Review</u>

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When deciding a motion for summary judgment, the court must review all the

evidence and draw all reasonable inferences in favor of the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In reviewing a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party, and it "may not make credibility determinations or weigh the evidence." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014). When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 360 (6th Cir. 2014). These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

When determining if summary judgment is appropriate, the court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. The court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

<u>Plaintiff's Objections to Defendant's Statement of Facts</u>

As an initial matter, Plaintiff objects to any reliance by Defendant on the witness statements or "Incident Reports" of Michelle Griffin, Brian Sorrell, Terry Hollingsworth, Kevin Hubble, Jeremy Alfter, and Brian Johnson and the interview notes of Jeff Bennett, Defendant's Human Resources Manager at the time of the relevant events, to prove that Plaintiff caused the

incident that led to the termination of his employment. According to Plaintiff, the unsworn statements of these witnesses and Bennett's interview notes contain inadmissible hearsay and, thus, do not set out facts that would be admissible in evidence as required by Fed. R. Civ. P. 56(c)(4). Plaintiff also contends that the statements are unreliable because they do not show that the witnesses actually saw the events leading up to the incident in question.

Federal Rule of Civil Procedure 56(c)(4) requires an affidavit to be based on personal knowledge:

> An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c)(4*); see Mitchell v. Toledo Hosp.,* 964 F.2d 577, 584–85 (6th Cir. 1992) (district court properly disregarded affidavit submitted in opposition to summary judgment that was not based on personal knowledge and that did not set forth facts that would be admissible into evidence). Accordingly, a Rule 56 affidavit must fairly present evidence that would be admissible at trial, and it is the burden of the party submitting the affidavits to demonstrate that the witness has personal knowledge of the statements contained therein. *See Long v. Procter & Gamble Mfg. Co.*, 2005 WL 1631033 *1 (W.D. Tenn. July 8, 2005) ("Rule 56(e) requires that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. These three requirements are mandatory." (citations omitted)). The court cannot rely on inadmissible hearsay as a basis for a summary judgment decision. *See Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) ("Hearsay evidence ... must be disregarded.")

Defendant has responded that the witness statements and investigative report are not inadmissible hearsay because the statements are not offered for the truth of the matter asserted but, instead, as evidence of Defendant's good faith belief that Plaintiff was terminated for a legitimate, non-discriminatory reason. *See Rhodes v. Standard Parking Corp.*, 599 F. App'x 500, 506 (6th Cir. 2014) (discussing that a "statement that is not offered to prove the truth of the matter asserted but offered to show its effect on the listener is not hearsay.")  The Court agrees with Defendant's position and will consider the statements objected to by Plaintiff only in determining the effect those statements had on Defendant when making the decision to terminate Plaintiff.  That is, do the objected to statements show that Defendant had a good faith basis to terminate Plaintiff?

<u>Statement of Material Facts</u>

The parties have agreed that the following facts are undisputed for the purpose of deciding this motion only, except as noted.  (Def's St'ment of Mat. Fcts ("SOF"), ECF No. 34-2; Pl's Add. St'ment of Mat. Fcts ("ASOF"), ECF No. 38-1; Def's Rep. to Pl's Add. St'ment of Mat. Fcts ("RASOF"), ECF No. 40-1.)

Kohler manufactures shower doors and other bathroom accessories at its Union City, Tennessee, manufacturing plant.  Kohler has written policies prohibiting race discrimination.

Kohler has a progressive discipline policy involving several steps, from "Notification" to "Level I" to Level II" to "Level III with Suspension" to "Termination." Discipline progresses along different paths for attendance and performance/misconduct. Disciplinary actions roll off after a period of twelve months, but only if no other discipline has been issued in the interim. Kohler may skip steps of discipline based on the nature, severity, and circumstances of the infraction but may not do so in a discriminatory manner.

In addition to the progressive discipline policy, employee associates may be suspended pending investigation of an incident if this is done in a non-discriminatory manner. Such a suspension remains in effect until Kohler completes its investigation and decides whether to take disciplinary action.

The term "PIV" refers to powered industrial vehicles like forklifts. A Kohler associate is required to have a PIV license and to undergo PIV training before being permitted to drive a PIV.

Associates are required to immediately report any accident, including a PIV incident, to management. When an associate is involved in a PIV incident involving property damage, injury, or both, the associate involved in the incident is sent for a drug test, any associate injured is sent for medical treatment, and an investigation is conducted.

Initially, the supervisor of the associate alleged to have caused the incident investigates the matter, at times with the assistance of Safety Specialist Brian Hays. Once the investigation is complete, the matter is brought to the attention of higher levels of management. Human Resources ("HR") may be involved in a PIV investigation if there is an injury.

As a general practice, if the investigation concludes that the associate followed appropriate guidelines but the incident happened anyway, the associate typically will not be disciplined. If the investigation concludes that the associate did not follow the appropriate guidelines and/or did something (or failed to do something) that caused the accident, the associate will be disciplined.

While someone in HR usually signs off on written discipline, HR does not get involved in PIV investigations unless someone is injured during the accident or management seeks HR advice.

When operating a PIV with a load that obstructs the driver's view, the driver is required to operate the vehicle backwards at a slow speed.

Kohler hired Plaintiff, an African American male, on April 22, 2002, as a builder/packer. Beginning in 2008 or 2009 through March 11, 2015, Plaintiff wore his hair in long braids ("dreads" or "dreadlocks") as a symbol of and in honor of his African-American heritage and culture.

In November 2009, Plaintiff was moved to the Kohler Operating System Facilitator position ("KOS Facilitator"). Senior Project Analyst Buddy Thompson placed Plaintiff in the KOS Facilitator position.[1] As KOS Facilitator, Plaintiff reported to Thompson; beginning in 2010 or 2011, he reported to Brian Halford; and, at times, he also reported to the Plant Manager Matt Wright.

In July 2013, Plaintiff was moved to the Team Leader 3 position. As a Team Leader, Plaintiff was responsible for leading and motivating a crew of associates to meet production goals while working safely and efficiently. Plaintiff was in a leadership position and viewed himself that way. In the Team Leader position, Plaintiff reported to George Rogers, who reported to Brian Halford. In his resume, Plaintiff identified and described the job duties of the KOS Facilitator and the Team Leader 3 as being the same.

On October 28, 2013, Kohler issued a "notification" write-up to Plaintiff for an incident in which Plaintiff was operating a PIV in a manner that resulted in property damage – broken glass. Plaintiff contends that he should not have received this write-up because the incident was due to a pothole in the floor. The written statement Plaintiff provided to Kohler in connection

---

[1] The parties dispute whether Thompson was solely responsible for making the decision to place Plaintiff in the KOS Facilitator position or whether Manufacturing Manager Jeff Bennett and Engineering Manager Dennis Amend participated in the decision. This dispute is not relevant to the Court's decision.

with this incident does not reference a pothole although Plaintiff testified in his deposition that there was a pothole. George Rogers and Joe Chapman signed the notification write-up. Jeff Bennett was not involved in the decision to give Plaintiff this write-up.

On September 19, 2014, Kohler issued a Level I write-up to Plaintiff in connection with an incident in which he was observed, on videotape, walking under a suspended load of materials, which was a safety violation. Plaintiff admits that he should have received the Level 1 write-up. The Level 1 write-up was signed by George Rogers and Randy Workman. Jeff Bennett was not involved in the decision to give Plaintiff this write-up.

On or about October 8, 2014, Plaintiff was involved in another PIV incident which involved broken glass. Plaintiff did not receive any disciplinary action related to this incident because the investigation revealed that it was caused by a process failure and was not Plaintiff's fault.

On March 11, 2015, there was another PIV incident in which Terry Hollingsworth, a Caucasian, reported to Barry Farley that, while he was on a pallet jack stopped in the aisle, Plaintiff was driving a forklift and hit the pallet jack from behind. Hollingsworth reported that the collision knocked him off the pallet jack and injured him. Hollingsworth's injury required first aid treatment but was not OSHA recordable.

According to Plaintiff, he was operating a forklift to move a load of cartons when he felt a bump, which he assumed was the cargo shifting. Plaintiff maintains that his forklift was stationary and not moving when he felt the bump, although he was letting his forklift straight down vertically. According to Plaintiff, he did not report this incident to anyone at Kohler because he did not know that he had hit anyone.

About forty-five minutes to one hour after the incident, Rogers and Brian Hays advised

Plaintiff that Hollingsworth had reported that Plaintiff had hit him. They told Plaintiff that he needed to be drug tested. Plaintiff claims that he had no knowledge that he was involved in a PIV incident until this conversation.

Kohler conducted an investigation into the incident. Initially, the investigation was conducted by Rogers and Hays. On March 11, 2015, Rogers obtained a written statement from Plaintiff regarding the incident in which Plaintiff stated:

> I was dropping cartons off to cell in designated area lower forks while still under load I felt a bump. When I looked up I saw Terry H. with a load of tubs drive off. I pulled out from under the load while Corey S. pushed cartons into place.

Also on March 11, 2015, Rogers and Hays obtained written statements from Hollingsworth and other associates Brian Sorrell, Kevin Hubble, Brian Johnson, Jeremy Alfter, and Michelle Griffin. Later, Bennett conducted interviews with Plaintiff, Hollingsworth, Sorrell, and Griffin.

During his interview with Bennett, Sorrell reported that "Richard had a big load on his forks. There was no way Richard could see."[2] Sorrell's written statement identified the parties to the incident as "Forklift Driver A" and "Forklift Driver B," without mentioning the names of Plaintiff or Hollingsworth. Although Sorrell's written statement does not name the drivers, during Bennett's interview of Sorrell, Sorrell named Plaintiff and Hollingsworth as the drivers.

Griffin reported that she saw Plaintiff "on forklift with load of boxes driving forward (could not see over load)."[3] She also reported that she saw him looking to the side of his load. She saw that Plaintiff "was going to run into Terry's load," and she "hollered," but "it was too late." She saw Hollingsworth "stumble" and then put his arm on his back.

---

[2] As noted previously, the statements of Defendant's witnesses are admissible only for the purpose of deciding whether Defendant had a good faith basis for its belief that Plaintiff hit Hollingsworth with his forklift and not to prove that Plaintiff did, in fact, hit Hollingsworth.

[3] Griffin stated Plaintiff could not see above his load but was leaning over to see around it. She did not say that Plaintiff could not see around his load.

Hubble and Alfter reported that they did not see the collision but observed the immediate aftermath, including Hollingsworth yelling and/or grabbing his back. Johnson reported that he did not see the impact but heard the noise.

Farley's report identified two direct causes of the incident – congestion in the area and Plaintiff's driving forward with an obstructed view.

On March 11, 2015, Rogers presented Plaintiff with a write-up reflecting that he was being suspended pending investigation in connection with the alleged PIV incident. Plaintiff refused to sign the document because he stated that he did not know exactly what had happened.

On March 12, 2015, Bennett interviewed Plaintiff concerning the incident and obtained a written statement. Randy Workman was present for part of the interview. During the interview, Plaintiff told Bennett, *inter alia*:

. He felt a bump. He didn't know if he was hit by Terry.

. Terry had a load of tubs on his lift. Didn't think anything about it.

. Backed out and no one was in the aisle.

. He normally drives forward.

. Claims that he could see over the cartons and could see the aisle. He didn't see Terry until he felt a thud.

At his deposition, Plaintiff testified that he told Bennett that he could see the top of Hollingsworth's head "over the top of the load."

During the interview, Bennett advised Plaintiff that there were witnesses to the incident who reported that Plaintiff could not see over the load that Plaintiff was carrying on the forklift. Plaintiff disputes that there were any such witnesses but not that Bennett told him that there were witnesses.

Bennett had at least two discussions with Plaintiff regarding the incident – on March 12, 2015, and March 17, 2015. On both occasions, Plaintiff denied that he had done anything wrong.

Kohler requires an employee driving a PIV to have an unobstructed view.

If an investigation into a PIV incident concludes that the associate "followed the appropriate guidelines," the associate is not disciplined.

Bennett notified Plaintiff of his termination during an in person meeting in Bennett's office on March 17, 2015. During the meeting, Bennett advised Plaintiff that he was being terminated "because of the incident" and that it was protocol that he be terminated. Defendant's stated reason for terminating Plaintiff was his alleged conduct in connection with the PIV incident, including his violation of PIV policy, his failure to report the incident, his refusal to take responsibility for the incident, and his dishonesty during the investigation. Plaintiff disputes that he violated any PIV policy or that Kohler was reasonable in concluding that he did so.

The decision to terminate Plaintiff's employment was made by Jeff Bennett and Randy Workman (General Supervisor – Manufacturing). No one expressly told Plaintiff that his termination was based on his race.

Prior to the March 2015 incident, Plaintiff was at Level 1. Kohler skipped disciplinary Levels 2 and 3 in terminating Plaintiff.

Kohler told the Tennessee Department of Labor that it terminated Plaintiff for an alleged safety violation and PIV incident, for failure to report the alleged incident, and for denying that the alleged incident occurred or that he caused it.

After his termination, Plaintiff was replaced in his Team Leader position by Ben Adams, who is African American.

In June 2013, John Choate, an Assembly 3 associate, was involved in a discussion with

Brian Hays in which he used the terms "kiss my ass" and "asshole." Choate acknowledged his misconduct and apologized twice. He was suspended for three days and placed on final warning for this conduct. He had no pending discipline for misconduct when this incident occurred.

In 2014 and 2015, Choate was involved in several PIV incidents that resulted in broken glass but no injuries to Choate or other associates. Choate was determined to be at fault, and he was disciplined.

Choate received the following progressive discipline in connection with PIV incidents involving broken glass: 9/23/2014 – Notification; 11/12/2014 – Level I (Choate was determined not to be at fault but he had had three incidents in a short period - two of which he was determined not to be at fault and this discipline was issued to document that); 2/26/2015 – Level II. At no time was Choate moved to a "non-PIV" position for any reason, including because he had too many PIV incidents.

Matt Covey had PIV incidents on April 30, 2010, May 25, 2010, and January 19, 2011. Covey was "suspended pending investigation" for each of these incidents but was not terminated. None of these incidents resulted in injury to another associate. At the time of these incidents, Covey reported to Supervisor Clint Worrell.

Each of the three Covey incidents involving PIVs resulted in broken glass due to the rope breaking while Covey was transporting the glass. For each of the incidents, Covey was drug tested and was suspended pending investigation because the drug tests were initially positive. After further review by the Medical Review Officer, it was determined that the positive drug test results were due to a medication Covey was taking pursuant to a valid prescription, and the drug test was adjudged to be negative.

Covey received a notification level discipline for the incident that occurred on April 30,

2010, based on the conclusion that he had not inspected the rope prior to moving the glass. Covey did not receive discipline in connection with the other two incidents because it was determined that Covey had followed the required protocol and that the incidents were due to a defect in the process.

When Plaintiff was disciplined for walking under a suspended load, Covey told Plaintiff he also had done that before, but no one had seen Covey doing it, unlike Plaintiff who had been observed on videotape.

Plaintiff believes that Kevin Hubble was accused of falsifying documentation regarding production numbers and was only suspended for a half day as a result. Plaintiff's belief is based on conversations he had with a former Kohler supervisor and two coworkers. There is no record of any such allegations against Hubble or an investigation of any such allegations against Hubble. In August 2014, Hubble was disciplined in connection with an incident when a door was mislabeled.

Adam Pruitt allegedly told Plaintiff he had more incidents than Plaintiff and had been on final warning at one time, but Plaintiff does not have any personal knowledge of this. Pruitt's records reflect that he was involved in several incidents involving property damage, but investigations into those incidents revealed that Pruitt was not at fault, and, thus, no discipline was issued.

On January 8, 2015, Joe Reason was in a Back-Up Team Leader position when he was involved in a PIV incident wherein he accidentally caught a temporary associate between a rack and a tape machine. The associate was injured but was not hospitalized. At the time of this incident, Reason reported to Supervisor Billy Smith.

Based on an investigation of the Reason incident, Kohler issued a notification level

warning to Reason because: Reason had no pending discipline relating to PIV/safety incidents; the incident was due, in part, to the fact that the temporary associate was crouching down so that Reason could not see him and the associate who was guiding Reason also could not see him; and Reason immediately reacted to the incident with concern for the affected associate and took responsibility for his actions.

Randy Workman (Manufacturing Manager), George Rogers (Plaintiff's supervisor), and Brian Hayes (Safety Manager) discussed whether to immediately suspend Plaintiff pending investigation of the alleged March 2015 PIV incident. HR Manager Bennett was informed of the decision to suspend Plaintiff pending the investigation and signed the employee contact record regarding Plaintiff's suspension pending investigation as an HR representative.

Workman, Rogers, Hayes, and Bennett were involved in the actual investigation of the March 2015 PIV incident, while Workman and Hayes participated in investigating Reason's PIV incident. Workman signed Plaintiff's suspension and Reason's notification resulting from their alleged PIVs with injuries. Bennett and Workman both participated in the decision to terminate Plaintiff's employment relating to the March 2015 PIV incident. Bennett was involved in Plaintiff's termination and was notified of the completion of Reason's PIV incident investigation and that Reason's discipline would consist only of a notification for his PIV incident with an injury.

Caucasian associate Steve Johnson was suspended pending investigation effective August 7, 2014, based on allegations that he was taking excessive breaks. He remained on suspension through August 18, 2014, when his employment was terminated. Johnson was terminated for providing misleading information in connection with the investigation.

Caucasian associate Don Lane was suspended pending investigation effective October

12, 2014, based on his involvement in a PIV incident. He remained on suspension through October 20, 2014, when his employment was terminated. According to Defendant's "Reason for Separation," his long suspension was due to his acceptance of another job and failure to timely return to complete the investigation.

Caucasian associate Matt Hoffman was suspended pending investigation effective May 29, 2015, based on allegations of fraudulent activity in his time records. He remained on suspension through June 5, 2015, when he was terminated. Hoffman had no pending disciplinary action in his file at the time of his termination.

On one or two occasions, Brian Hays made comments about Plaintiff's hairstyle – that it was "girlie" and that it looked like Plaintiff had worms on his head. Jeff Bennett (Caucasian) also commented that Plaintiff's dreadlocks were "girlie."

Bennett commented to Plaintiff that he was uncomfortable with the relationship between Plaintiff (African-American) and Brian Halford (Caucasian), after Halford became Plaintiff's direct supervisor. During Plaintiff's issues with Ronnie Coneal (an African-American who did not have dreadlocks like Plaintiff) that Plaintiff was supervising, Bennett responded to Plaintiff that "we'll move you before we'll move him because obviously you're the problem."

On one occasion, Workman (Caucasian) indicated that he was surprised that Plaintiff was selected for a KOS position (a possible stepping-stone to a supervisor position) and pointed to Plaintiff's arm, which Plaintiff interpreted to mean that Workman's surprise was due to the color of Plaintiff's skin.

Plaintiff got along well with Rogers, and they were generally fine with each other, notwithstanding that they would make jokes and comments to each other. But, at times, Plaintiff would tell Rogers that he was going "too far" when making racial comments.

On one occasion in 2014, Rogers was watching a video and there were "monkeys or something" on the screen and Rogers said "look Richard, your cousin." Plaintiff did not report this incident to HR or anyone in management at Kohler because Rogers, as a supervisor, was part of Kohler's management. Additionally, Plaintiff thought that Josh Barner, a temporary supervisor, had witnessed the incident.

On two occasions, in 2014, Rogers made a comment about Plaintiff's hair that he looked like "Predator." No one else in management or HR made any negative or derogatory comments regarding Plaintiff's hairstyle.

<u>Analysis</u>

Plaintiff claims that he was terminated because of his race in violation of Title VII, § 1981, and the THRA and in retaliation for having an interracial relationship with a manager. Plaintiff also claims that his job reassignment from KOS Facilitator to Team Leader violated § 1981. Defendant contends that Plaintiff's termination claim fails because (1) he was not replaced by or treated differently than similarly-situated, non-protected associates and (2) Kohler had a legitimate, non-discriminatory reason to terminate Plaintiff's employment and Plaintiff cannot establish pretext. Defendant also contends that Plaintiff's job reassignment claim fails because this was not an adverse employment action. Finally, Defendant contends that Plaintiff's retaliation claim fails because (1) he did not engage in protected activity, (2) there is no causal connection between any protected activity and his termination, and (3) Kohler had a legitimate, non-discriminatory reason to terminate his employment and Plaintiff cannot establish pretext.

Because Plaintiff has presented no direct evidence of discrimination,[4] the Court will

---

[4] "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.,* 176 F.3d 921, 926 (6th Cir. 1999).

analyze Plaintiff's claims under the *McDonnell Douglas* burden-shifting framework.  *See White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 238 (6th Cir. 2005) (reiterating that a plaintiff can establish a claim of discrimination under Title VII by producing either direct or circumstantial evidence of discrimination and, when a plaintiff proceeds on his claim using circumstantial evidence, the court must use the *McDonnell Douglas* framework).[5]

To establish a prima facie claim of racial discrimination, Plaintiff must demonstrate that: (1) he was a member of a protected class; (2) he suffered an adverse employment action; (3) he was qualified for the position; and (4) a person outside of the protected class was treated more favorably than he.  *See Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 703 (6th Cir. 2007). In the context of a discrimination claim, an adverse employment action "requires a materially adverse change in the terms and conditions of employment." *Watson v. City of Cleveland*, 202 F. App'x 844, 854 (6th Cir. 2006). The adverse change "must be more disruptive than a mere inconvenience or an alteration of job responsibilities" such as " termination of employment, a demotion evidenced by a decrease in wage or salary, ... a material loss of benefits, ... or other indices that might be unique to a particular situation. " *Id.* (quoting *Kocsis v. Multi–Care Mgmt. Inc.*, 97 F.3d 876, 886 (6th Cir. 1996)).

Here, it is undisputed that Plaintiff was a member of a protected class and that he suffered an adverse employment action when he was terminated from a position for which he was qualified.  However, to establish a prima facie case, he must also show that a person outside his protected class was treated more favorably.

---

[5]  Although Plaintiff has brought his claims under Title VII, § 1981, and the THRA, the Court analyzes the claims together under the same standards.  *See Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999) (noting that § 1981 claims are reviewed "under the same standards as claims of race discrimination brought under Title VII"); *Mullins v. Goodyear Tire & Rubber Co.*, 291 F. App'x 744, 745 n. 1 (6th Cir. 2008) ("The THRA is a state law analogue to Title VII and the statutes are analyzed identically.").

If Plaintiff establishes a prima facie case, "the burden shifts to the defendant to articulate a 'legitimate, non-discriminatory reason' for the employment decision." *Clay*, 501 F.3d at 703. If Defendant does so, "the burden shifts back to the plaintiff to show that the reason put forth by the defendant is pretextual, which can be done by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Id.* (quotation marks omitted).

To establish a prima facie claim of retaliation, a plaintiff must show that: (1) the employee engaged in protected activity; (2) the employer had knowledge of this fact; (3) the employee suffered an adverse employment action; and (4) there is a causal connection between the protected activity and the adverse employment action. *See Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003); *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). The causal connection must be proven by sufficient evidence to create an inference that, had the plaintiff not engaged in his protected rights, the defendant would not have taken the adverse action. *Id.* If the plaintiff successfully establishes a prima facie case, "a presumption of unlawful retaliation arises and the burden of production shifts to the defendant to rebut the presumption by articulat[ing] some legitimate, nondiscriminatory reason for its action." *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 674 (6th Cir. 2013) (citation and internal quotation marks omitted), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013); *Fuller v. Mich. Dep't of Transp.*, 580 F. App'x 416, 423 (6th Cir. 2014). Then, if the defendant successfully produces a legitimate, nondiscriminatory reason, "the burden of production returns to the plaintiff to demonstrate by a preponderance of the evidence that the proffered reason was a mere pretext for discrimination." *Fuhr*, 710 F.3d at 675 (citing *Abbott*, 348 F.3d at 542).

Job Reassignment and Retaliation

Plaintiff's response addresses only his claim that he was terminated because of his race. (Pl's Resp. p. 1, ECF No. 38.) He has not responded to the portion of Defendant's motion seeking summary judgment on his claims that he was retaliated against for having an interracial relationship with a manager or that his job reassignment from KOS Facilitator to Team Leader in 2013 violated 28 U.S.C. § 1981.[6] Therefore, Defendant's evidence on these claims is unrefuted.[7]

Defendant's evidence concerning the job transfer shows that, effective November 2009, Plaintiff was placed in the Kohler Operating System Facilitator position. In July 2013, then Manufacturing Manager Joe Chapman decided to move Plaintiff out of the KOS Facilitator role because he was not satisfied with Plaintiff's job performance. (SOF ¶¶ 19, 61, ECF No. 34-2.) Plaintiff was reassigned to the Team Leader 3 position with no change in pay or shift. (SOF ¶ 62.) As a Team Leader, Plaintiff was responsible for leading and motivating a crew of associates to meet production goals while working safely and efficiently. Plaintiff understood that this was a leadership position. (SOF ¶ 19.)

The Court finds that Plaintiff's reassignment from KOS Facilitator to Team Leader was not an adverse employment action. As noted above, an adverse employment action is a "materially adverse change in the terms or conditions of employment because of the employer's actions," *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 593 (6th Cir. 2007) (quotations omitted), and "must be more disruptive than a mere inconvenience or an alteration of job

---

[6] Only § 1981 applies to this cause of action because Plaintiff's claim that his reassignment was discriminatory is barred by the statute of limitations under Title VII and the THRA. *See* 42 U.S. Code § 2000e; T. C. A. § 4-21-311.

[7] In a footnote, Plaintiff maintains that there is "a question of fact as to whether Plaintiff was transferred from the prestigious KOS position that might lead to supervisor job to a Team Leader position due to [] racial animus." (Pl's Resp. p. 18 n. 55.) Plaintiff makes this statement in the context of whether the managerial employees who were involved in Plaintiff's termination had a racial bias against Plaintiff and not as it relates to Plaintiff's separate claim that the transfer itself violated § 1981.

responsibilities." *Kocsis*, 97 F.3d at 886 (citation omitted). Thus, reassignments or lateral transfers without accompanying changes in salary, benefits, title, work hours, or material responsibilities do not constitute adverse employment actions. An employee's subjective preference for one position over another is insufficient to render a lateral transfer an "adverse employment action." *Momah v. Dominguez,* 239 F. App'x 114, 123 (6th Cir. 2007) (internal citations omitted).

Here, the undisputed evidence shows that Plaintiff's reassignment from KOS Facilitator to Team Leader did not impact his pay, benefits, or shift, (SOF ¶ 62, ECF No. 34-2), and the positions had similar responsibilities. (SOF ¶¶ 16, 19, 21.) When describing his employment with Kohler on his resume, Plaintiff combined both positions into one with the same job duties. (SOF ¶ 21.) Plaintiff's personal preference for the KOS Facilitator position is insufficient to establish that his reassignment was an adverse employment action. *See Hensley v. Rutherford County, Tenn.*, 2015 WL 1549272 at *8 (M.D. Tenn. 2015) (granting summary judgment for defendant when the plaintiff suffered no loss of pay or benefits and only demonstrated a subjective dissatisfaction with having different job duties). Accordingly, Defendant is entitled to judgment as a matter of law on Plaintiff's claim that his job reassignment violated § 1981.

Plaintiff's retaliation claim also fails. Plaintiff contends that he was terminated in retaliation for his friendship and social relationship with Brian Halford, his Caucasian supervisor. However, he has not shown that he engaged in any protected activity or that any alleged protected activity and his termination were causally connected

An employee engages in protected activity if he "has opposed any practice made unlawful by" an anti-discrimination statute, or if he has "participated in any manner in an investigation, proceeding, or litigation under" an anti-discrimination statute. *Aldrich v. Rural*

*Health Serv. Consortium, Inc.*, 579 F. App'x 335, 337 (6th Cir. 2014). Plaintiff has presented no evidence that he opposed any practice or participated in any investigation, proceeding, or litigation involving an anti-discrimination statute. Instead, Plaintiff relies on Defendant's perceived disapproval of Plaintiff's interracial friendship with Halford, which is not a "protected activity" within the meaning of the anti-discrimination laws. Plaintiff's failure to establish that he engaged in a protected activity defeats his claim. *See, e.g., Robbins-Foster v. Ohio Dep't of Taxation,* 2010 WL 3221905 at *6 (S.D. Ohio Aug. 13, 2010) (finding that the plaintiff's friendship with another employee who "got into a dispute with… the Division manager" could not "form the basis for a Title VII retaliation claim"); *Prichard v. Ledford*, 767 F. Supp. 1425, 1429 (E.D. Tenn. 1990), *aff'd*, 927 F.2d 605 (6th Cir. 1991) (finding that the plaintiff had "not satisfied the first element of his retaliation claim" … because "[he] clearly was not engaged in a protected activity" when he failed to encourage his sister to have a social relationship with his supervisor).

Even if Plaintiff had shown that he engaged in protected activity, he has not pointed to any evidence that his alleged protected activity and adverse employment action were causally connected. A plaintiff has to show but-for causation to establish a retaliation claim, and this standard "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 133 S.Ct. at 2533. Accordingly, Plaintiff must point to evidence creating a question of fact as to whether Defendant would have terminated him had he not been friends with Halford.

Instead, the undisputed evidence shows that Bennett began expressing his concerns about Plaintiff's having lunch with Halford only after Plaintiff started reporting directly to Halford and Bennett was concerned that it might appear to other associates that Halford was showing

favoritism to Plaintiff. (SOF ¶ 59, ECF No. 34-2.) Plaintiff testified in his deposition that, "[Bennett] said he was uncomfortable with our relationship, being that I worked for [Halford]." (*Id.*) Bennett did not express any concern about the friendship until a possible conflict of interest arose. (SOF ¶¶ 58-59.)

Because Defendant has pointed to evidence in the record refuting Plaintiff's allegation that Bennett's concern about the friendship of Plaintiff and Halford was racially motivated or that retaliation for the friendship led to Plaintiff's termination and Plaintiff has offered no countervailing evidence, Defendant is entitled to judgment as a matter of law on Plaintiff's retaliation claim.

Termination

Plaintiff alleges that he was terminated because of his race. As noted previously, it is undisputed that Plaintiff was a member of a protected class and that he suffered an adverse employment action when he was terminated from a position for which he was qualified. It is also undisputed that, following his termination, Plaintiff was replaced by another African American; therefore, to establish a prima facie case of racial discrimination, Plaintiff must identify a comparator who was treated more favorably than he was and present evidence that he and the comparator were similarly situated in all relevant respects. *See Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 522 (6th Cir. 2008). Defendant contends that Plaintiff has failed to do so, and, therefore, has not established a prima facie case.

To show that the comparator was similarly situated, he "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell*, 964 F.2d at 583. Although the "plaintiff need

not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered similarly-situated," *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 709–10 (6th Cir. 2006) (internal citation omitted), "the plaintiff must prove that all of the relevant aspects of his employment situation are 'nearly identical' to those of the non-[protected] employees who he alleges were treated more favorably." *Hatchett v. Health Care & Retirement Corp. of Am.*, 186 F. App'x 543, 548 (6th Cir. 2006). "Differences in job title, responsibilities, experience, and work record can be used to determine whether two employees are similarly situated." *Id.* (citing *Leadbetter v. Gilley*, 385 F.3d 683, 691 (6th Cir. 2004)).

In the disciplinary context, the plaintiff and the proposed comparator must have "engaged in acts of comparable seriousness." *Dickens v. Interstate Brands Corp.*, 384 F. App'x 465, 468 (6th Cir. 2010) (quotation omitted). The court may consider whether the employees "have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.*

In the present case, Plaintiff originally identified five comparators:  Matt Covey, John Choate, Kevin Hubble, Adam Pruitt, and Joe Reason; however, Plaintiff has abandoned Covey, Choate, Hubble, and Pruitt as comparators and has added Terry Hollingsworth so that he now relies only on Reason and Hollingsworth. (Resp. at p. 11, ECF No. 38.)  Defendant contends that neither individual is similarly situated to Plaintiff because neither individual (1) had two active disciplinary actions for PIV incidents; (2) violated written PIV guidelines while operating a PIV, which resulted in injury to another associate; (3) failed to report the PIV accident; (4) was found to be dishonest during the investigation of the incident; and (5) failed to accept responsibility for his actions in connection with the accident.

Looking at Hollingsworth first, he is not a proper comparator because his alleged conduct is different than Plaintiff's, most notably in that Hollingsworth was struck by Plaintiff's PIV. Hollingsworth's conduct did not cause a PIV incident. Although Hollingsworth took forty minutes to report the PIV incident, he did, in fact, report it, as opposed to Plaintiff who never reported the incident. And, there is no evidence that Hollingsworth violated any safety violation. Thus, Hollingsworth and Plaintiff are not similarly situated, and Hollingsworth cannot serve as a comparator.

Similarly, Reason is not a proper comparator although Reason and Plaintiff were both involved in PIV incidents that injured an employee. However, the evidence shows that Reason immediately reported his PIV incident to his supervisor, whereas Plaintiff did not report his incident at all. An employee who fails to self-report a safety violation is not similarly situated to an employee who does self-report. *See Morgan v. Kilgore Flares Co.*, 2010 WL 3420300 at *7 (W.D. Tenn. Aug. 26, 2010) (holding that the plaintiff, who did not self-report a safety violation, was not similarly situated to a co-worker who "immediately informed his supervisors of his actions"); *see also Alfrey v. AK Steel Corp.*, 211 F. App'x 393, 396 (6th Cir. 2006) (affirming summary judgment for an employer when the co-worker comparator was also involved in a coil truck accident but there was no evidence that the comparator failed to report it).

In addition, the investigation into the Reason's incident concluded that Reason did not violate any PIV/safety rules, whereas Plaintiff was found to have driven his PIV with an obstructed view, in violation of PIV/safety policy. Finally, Reason immediately took responsibility for his actions, whereas Plaintiff did not. Therefore, Reason is not similarly situated to Plaintiff.

In *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495 (6th Cir. 2009), the Court of Appeals

emphasized that an employer may choose to treat different rule violations more or less severely without the employees being deemed similarly situated. In that case, an employee was found guilty of filing a false injury report and was terminated. Another employee was found guilty of starting a truck before determining whether it was safe to do so and was not terminated. The Court held:

> [W]e look to similarly situated employees not to evaluate the employer's business judgment, but to inquire into the employer's "motivation and intent" to determine whether the employer was "motivated by retaliation." *Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987). Even though as outsiders, we may regard safety violations as severe as dishonesty, it is within the company's business judgment to treat differently-situated parties differently. Without similarly situated parties, we cannot adjudge the intent of the employer as to retaliation.

*Id.* at 503. *See also Curry v. SBC Commc'ns, Inc*., 669 F. Supp. 2d 805, 827 (E.D. Mich. 2009) ("The fact that other employees broke other rules - even ones perhaps appearing as serious as the ones with which the plaintiffs were charged - does not aid the plaintiffs in identifying a similarly situated individual.")

Because Plaintiff has failed to identify a similarly situated employee who was treated differently than he was, his claim for race discrimination fails at the prima facie stage. However, even if Plaintiff had established a prima facie case, Defendant would still be entitled to summary judgment because Defendant has presented a legitimate, non-discriminatory reason for Plaintiff's termination and Plaintiff has not shown that it was pretextual.

Defendant's stated reasons for terminating Plaintiff are that he violated PIV policy, failed to report the incident in violation of written safety requirements, refused to take responsibility for the incident, and was perceived to be dishonest during the investigation. As noted by Defendant, violations of work policy, failure to report an accident, and dishonesty during an investigation have all been found to be legitimate, non-discriminatory reasons to terminate an employee. *See*

*Richardson v. Wal-Mart Stores, Inc.*, 836 F.3d 698, 704 (6th Cir. 2016) (workplace-safety misconduct); *Hance v. BNSF Ry. Co.,* 645 F. App'x 356, 365 (6th Cir. 2016) (perceived dishonesty on job application); *Fouse v. Potter*, 2007 WL 1339836 at *2 (6th Cir. 2007) (failure to report an accident). Therefore, the burden shifts to Plaintiff to show that Defendant's stated reasons for the termination were a pretext for discrimination.

To demonstrate pretext, a plaintiff must show that: (1) the proffered reasons had no basis in fact; (2) the reasons did not actually motivate the decision; or (3) the reasons were insufficient to motivate the employment decision. *See Jones v. St. Jude Medical S.C., Inc*., 504 F. App'x 473, 477 (6th Cir. 2012). Plaintiff must introduce evidence to show that "the proffered reason was not the true reason for the employment decision and that discriminatory animus was the true motivation driving the employer's determination." *Grace v. USCAR*, 521 F.3d 655, 677-78 (6th Cir. 2003) (internal citations omitted). However, even if the plaintiff does provide sufficient evidence to create an issue of material fact regarding the proffered reasons, the defendant may still be entitled to summary judgment under the Sixth Circuit's "modified honest belief" rule. This rule provides that "for an employer to avoid a finding that its claimed nondiscriminatory reason was pretextual, the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 286 (6th Cir. 2012) (internal citations omitted).

In the present case, Plaintiff contends that there are disputed issues of fact as to whether Defendant's stated reason for his termination was pretextual because (1) the investigation conducted by Defendant did not actually show that Plaintiff committed a safety violation, and, thus, Defendant lacked a factual basis for terminating him and (2) "the key investigators and disciplinary decision-makers involved in those decisions had a history of making derogatory

comments about [Plaintiff's] race and dreadlock" which is evidence that their racial animus led to his termination. (Resp. at p. 6, ECF No. 38.)

Plaintiff does not dispute that, pursuant to Kohler policy, associates are required to immediately report any PIV incident to management or that, when there is a PIV incident involving property damage, injury or both, an investigation is conducted. If the investigation concludes that an associate did not follow the appropriate guidelines and/or did something (or failed to do something) that caused the accident, the associate will be disciplined.

It is also undisputed that, on March 11, 2015, Plaintiff was operating a forklift, moving a load of cartons. Terry Hollingsworth reported that Plaintiff hit the pallet jack on which he was standing and that the collision caused him to stumble off the pallet jack and hurt his back.[8] Plaintiff was suspended pending an investigation into the incident. During the investigation, Kohler obtained written statements from six witnesses. Several of the witnesses stated that Plaintiff was driving his PIV with an obstructed view. Other witnesses did not observe the impact but stated that they heard the noise of the impact and saw Hollingsworth grabbing his back in pain after being hit.[9]

Human Resources Manager Jeff Bennett had two discussions with Plaintiff regarding the incident – on March 12, 2015, and March 17, 2015 – during which Plaintiff denied any wrongdoing. Plaintiff claimed that he could see over his load and, while he admitted to feeling a "bump" at the time of the incident, denied that he had hit Hollingsworth and denied any

---

[8] Plaintiff continues to maintain that he did not report the incident because he did not have an obstructed view and did not hit Hollingsworth. The Court makes no finding as to whether Plaintiff did, in fact, hit Hollingsworth.

[9] As discussed above, these witness statements are not inadmissible hearsay because they are not offered for the truth of the matter asserted but, instead, as evidence of Kohler's good faith belief that Plaintiff was terminated for a legitimate, non-discriminatory reason. *See Rhodes*, 599 F. App'x at 506.

wrongdoing.

Based on Plaintiff's conduct in connection with the March 11, 2015, incident – including his violation of PIV policy (operating the forklift forward with an obstructed view), his violation of written safety procedures (failure to immediately report an accident), his refusal to take responsibility for the incident, and his dishonesty during the investigation (claiming that he could see over his load when several witnesses observed that he could not see) – Kohler made the decision to terminate his employment. This decision was made by Bennett and Workman.

Although Plaintiff challenges the accuracy of the witness statements, Plaintiff does not dispute that the information on which Kohler relied was, in fact, the information these associates reported to Kohler. "[A]s long as an employer has an honest belief in its proffered nondiscriminatory reason," *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001), the employee cannot establish pretext merely because he believes that the reason was incorrect. *See Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 287 (6th Cir. 2012) (explaining that the employer's honest belief would still be valid even if the court reached a different conclusion about the result of the investigation). Instead, the Court must look at "whether the employer made a reasonably informed and considered decision before taking an adverse employment action," *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998), when assessing whether an employer had an honest belief. An employer has an honest belief in its rationale when it "reasonably relied 'on the particularized facts that were before it at the time the decision was made.'" *Majewski*, 274 F.3d at 1117 (quoting *Smith*, 155 F.3d at 807)). "[W]e do not require that the decisional process used by the employer be optimal or that it left no stone unturned." *Smith*, 155 F.3d at 807.

To prevail, a plaintiff must "put forth evidence which demonstrates that the employer did

not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001) (citing *Smith*, 155 F.3d at 806–07). A plaintiff's assertion that he did not commit a violation of company policy "is insufficient to call into question [the employer's] honest belief that he did." *Majewski*, 274 F.3d at 1117.

Here, the undisputed facts show that Kohler conducted an investigation into the PIV incident following Hollingsworth's report that Plaintiff struck him. Based on this investigation, Kohler determined that Plaintiff had violated company policy by driving with an obstructed view and failing to report the PIV incident. Plaintiff has failed to point to any facts showing that Kohler did not make a reasonably informed and considered decision or that it did not honestly believe that Plaintiff violated company policy. Defendant Kohler was entitled to a "reasonable reliance on the particularized facts that were before it at the time the decision was made." *White v. Duke Energy-Kentucky, Inc.*, 603 F. App'x 442, 449 (6th Cir. 2015) (citing *Wright*, 455 F.3d at 708).

As explained in *Ladd*, 552 F.3d at 502-03:

> Ladd argues that she did not give a false injury report. The evidence suggests otherwise. The investigation, consisting of multiple interviews and a formal hearing where four witnesses in addition to Richert testified to not seeing Ladd in the bed of the truck and only Ladd testified to being in the truck, clearly provided a basis in fact for the adverse employment action. A Public Law Board that reviewed the investigation "found no improprieties and deem[ed] [that] the claimant was afforded a fair and impartial investigation." Even if all of Ladd's white co-workers did lie on Richert's behalf, Grand Trunk is not liable if it acted upon an honest belief in its non-discriminatory reason and made a reasonably informed and considered decision. *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 398 (6th Cir. 2008).

Plaintiff attempts to establish pretext by pointing out that Barry Farley concluded that a cause of the PIV accident was "congestions in that aisle/area." While Farley did identify

congestion as part of the cause of the incident, he also noted that Plaintiff's driving forward with an obstructed view was a direct cause of the accident. Farley also noted that the "targeted root/cause" of the incident was Plaintiff's "eyes/mind not on task." (Incid. Rep., ECF No. 38-6.)

Plaintiff also argues that there is evidence of pretext because Kohler's statements to the Tennessee Department of Labor were inconsistent with its disciplinary action. Plaintiff's initial disciplinary action stated that he was being suspended pending an investigation for a "safety incident involving a PIV." (Pl's Emp. Contact Record, ECF No. 38-11.) Plaintiff's separation notice stated that he was terminated due to a "violation of company policies/safety requirements." (Sep. Not.. ECF No. 38-9.) In its submission to the Tennessee Department of Labor, Kohler explained:

> Richard proceeded into the main aisle with a load of cartons raised up blocking his view and rear ended Terry on the pallet jack. Richard went on about his duties after the incident. Terry delivered the material that he had on his pallet jack then found his supervisor to report the incident. Richard never reported the incident and denied the incident during the investigation. Richard had already had several warnings for operating PIV unsafely and Richard was not willing to accept responsibility for his actions and in fact denied doing anything wrong.

(Unemp. Sub., ECF No. 38-13.) The Court finds that there is nothing inconsistent with Kohler's stated reason for terminating Plaintiff's employment and its submissions to the Tennessee Department of Labor.

Plaintiff argues that his race discrimination claim should be analyzed under the "mixed motive" theory. Under the mixed motive theory, "the focus remains on whether the plaintiff can meet his or her ultimate burden to prove intentional discrimination." *Harris v. Giant Eagle, Inc.*, 133 F. App'x 288, 297 (6th Cir. 2005) (quotations omitted) (dismissing plaintiff's mixed motive claim when there was "no connection whatsoever" between the racist comments and the termination). A plaintiff must establish that "race was a motivating factor in the termination

decision" such that there was a connection between the allegedly racist conduct and the termination decision. *Id.* Additionally, in a mixed motive case, the plaintiff must show that the racially charged conduct was made by decision-makers and in relation to the decision-making process. *Id.*

Plaintiff claims that four individuals made comments that the trier of fact could find showed discriminatory intent: Randy Workman, George Rogers, Brian Hayes, and Jeff Bennett.

Randy Workman

According to Plaintiff, on one occasion in 2012 or 2013, when Plaintiff was working in the KOS Facilitator position, Workman made the comment that he could not believe that Plaintiff had gotten that job and pointed at Plaintiff's arm – which Plaintiff interpreted to mean a reference to Plaintiff's skin color. Although Workman was a decision-maker in Plaintiff's termination, this comment was an ambiguous remark, made two or three years before Plaintiff's termination, and it was not related to the termination decision. *See Rowan v. Lockheed Martin Energy Systems, Inc.*, 360 F.3d 544, 549 (6th Cir. 2004) (finding that a stray remark by decision-maker years before termination did not establish discriminatory motive). "[G]eneral, vague, or ambiguous comments do not constitute direct evidence of discrimination because such remarks require a factfinder to draw further inferences to support a finding of discriminatory animus." *Curry v. Brown*, 607 F. App'x 519, 523 (6th Cir. 2015). Accordingly, Workman's ambiguous comment and gesture, made two to three years before Plaintiff's termination, is not evidence that Plaintiff's race was a motivating factor in Kohler's decision to terminate him.

George Rogers

Plaintiff claims that, in 2014, Rogers referred to monkeys in a video as Plaintiff's cousin and referred to Plaintiff's dreadlocks as making him look like the "Predator" in the movie *Alien*.

However, even if he did make the comments, they cannot serve as evidence that race was a motivating factor in Plaintiff's termination because Rogers was not a decision-maker in Plaintiff's termination and the comments were not made in connection with Plaintiff's termination. An "isolated comment by a coworker lacks any connection to a decision-maker or to her termination, and thus, fails to raise an inference of a discriminatory motive." *Seig v. Mercy Franciscan at Schroeder*, 2015 WL 1036085 at *7 (S.D. Ohio Mar. 10, 2015).

Brian Hays

Plaintiff asserts that Hays compared his dreadlocks to worms. Again, even if Hays made any such comments, they are not evidence that race was a motivating factor in Plaintiff's termination because Hays was not a decision-maker, the comments occurred several years prior to Plaintiff's termination, and the alleged comments were not made in connection with Plaintiff's termination. *See Harris*, 133 F. App'x at 296 ("[T]he fundamental problem in Harris's case is that she has introduced no evidence that tends to prove that the person who made racially discriminatory remarks had any role in her firing.")

Jeff Bennett

Plaintiff claims that Bennett made two comments that referred to his hair as "girlie" because it was long. Plaintiff also claims that Bennett expressed concern with Plaintiff's friendship with Brian Halford, given that Plaintiff reported directly to Halford and it might appear to other associates that Halford was showing favoritism to Plaintiff. Although Bennett was a decision-maker, his isolated comments about Plaintiff's hair, made four to five years prior to Plaintiff's termination, are not evidence that race was a motivating factor in Plaintiff's termination because Plaintiff has offered no evidence to connect these comments with Bennett's decision to terminate his employment.

In addition, Bennett's alleged comments were ambiguous, as it is unclear whether Bennett referred to his hair as "girlie" because it was long or because it was associated with race. Ambiguous comments are not evidence that race was a motivating factor in an employment decision. *See Reed v. Proctor and Gamble Mfg. Co.*, 927 F. Supp.2d 508, 526 (W.D. Tenn. 2013) (finding no direct evidence when "the evidence is ambiguous and would compel a reasonable juror to draw one or more inferences from the testimony to conclude that it was probative of [the manager's] discriminatory intent."). Finally, as discussed above, the record shows that Bennett disapproved of Plaintiff's friendship with Halford because Halford was Plaintiff's direct supervisor; there is no evidence that this disapproval was based on the fact that their friendship was interracial.

Plaintiff has presented no evidence that these comments or Workman's gesture were related to Kohler's decision to terminate Plaintiff's employment. Therefore, the comments and the gesture do not constitute evidence of discrimination because they were not made in connection with Kohler's decision to terminate Plaintiff's employment. *See Stefanski v. W.W. Grainger, Inc.*, 155 F. App'x 177, 184 (6th Cir. 2005) (affirming summary judgment when there was no evidence that allegedly discriminatory comments were made in connection with the decision-making process). Plaintiff's claim for "mixed motive" racial discrimination fails as a matter of law.

Because Plaintiff has not established a prima facie case of discrimination or retaliation and, even if he has, he has not shown that Defendant's stated legitimate, non-discriminatory reason for Plaintiff's termination was pretextual, Defendant is entitled to judgment as a matter of law, and Defendant's motion for summary judgment is **GRANTED**, and the Clerk will enter judgment for Defendant.

The joint motion to continue the trial of this matter is **DENIED** as moot.

**IT IS SO ORDERED.**

                                          **s/  S. Thomas Anderson**
                                          S. THOMAS ANDERSON
                                          CHIEF UNITED STATES DISTRICT JUDGE

                                          Date:  August 22, 2017.